UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____-Civ-_____

ANTHONY M. ABRAHAM, Individually and
on Behalf of All Others Similarly Situated,

<u>CLASS ACTION</u>

Plaintiff,

vs.

CELSIUS HOLDINGS, INC., JOHN
FIELDLY, and JARROD LANGHANS,

Defendants.

_____ /   <u>DEMAND FOR JURY TRIAL</u>

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Anthony M. Abraham ("Plaintiff"), by Plaintiff's undersigned attorneys, on behalf of Plaintiff and all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Celsius Holdings, Inc. ("Celsius" or the "Company"), press releases issued by Celsius, public statements issued by defendants, securities analysts' reports about the Company, media reports about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      This is a securities class action on behalf of all persons who purchased Celsius stock or sold Celsius puts during the period between February 29, 2024 and September 4, 2024 ("Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the claims asserted in this complaint pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act.  Celsius is headquartered in this District and certain acts and conduct complained of herein, including the dissemination of many of the materially false and misleading information to the investing public,

occurred in this District.  The Company's headquarters are located in this District at 2424 North Federal Highway, Suite 208, Boca Raton, Florida 33431.

4.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## PARTIES

5.     Plaintiff Anthony M. Abraham transacted in Celsius securities during the Class Period, as set forth in the certification attached hereto and incorporated by reference, and suffered damages as a result of the conduct alleged herein.

6.     Defendant Celsius, incorporated in Nevada, is a holding company that develops, processes, markets, distributes, and sells energy drinks and liquid supplements in the United States and internationally.  Celsius common stock trades on the NASDAQ under the ticker symbol "CELH," and as of July 30, 2024, the Company had more than 233 million shares issued and outstanding.

7.     Defendant John Fieldly ("Fieldly") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and the Chairman of its Board of Directors ("Board").

8.     Defendant Jarrod Langhans ("Langhans") was, at all relevant times, the Company's Chief Financial Officer ("CFO").

9.     Defendants Fieldly and Langhans are collectively referred to as the "Individual Defendants."  The Individual Defendants, together with Celsius, are collectively, "Defendants."

10.     The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of Celsius securities during the Class Period.  The Individual

- 2 -

Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Celsius' press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pled herein.

11.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose non-public facts known to them about Celsius and the true market value of its securities. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Celsius securities was a success, as it: (i) deceived the investing public regarding Celsius' prospects and business; (ii) artificially inflated the market price of Celsius securities; (iii) allowed certain officers, directors, and insiders to generate enormous insider proceeds by selling more than 21.6 million of their personally held shares of Celsius common stock at artificially inflated prices, reaping more than $1.4 billion; and (iv) caused Plaintiff and other members of the Class (defined below) to purchase Celsius securities or sell Celsius puts at artificially inflated prices and suffer damages as the true facts regarding Celsius were revealed.

## CLASS ACTION ALLEGATIONS

12.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons who purchased Celsius stock or sold Celsius puts during the Class Period (the "Class"). Excluded from the Class are Defendants, members of their immediate families, and officers and directors of Celsius and their immediate families.

13.     The members of the Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Celsius stock trades on the NASDAQ, Celsius has more than 233 million shares outstanding, owned by hundreds, if not thousands, of persons, and there was a robust market for other Celsius securities.

14.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and each member of the Class purchased Celsius stock or sold Celsius puts during the Class Period and sustained damages from Defendants' wrongful conduct.

15.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

16.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable, and the damages suffered by individual members of the Class may be relatively small, making the expense and burden of individual litigation to seek redress individually for the wrongs done to them an impossible hurdle for members of the Class. There will be no difficulty in the management of this action as a class action.

17.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts and omissions as alleged in this complaint violated the Exchange Act; and

(b)     whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

## SUBSTANTIVE ALLEGATIONS

**Background**

18.     Through its operating subsidiaries, the Company offers various products in the functional energy drink category in the United States and internationally.  The Company's flagship asset is CELSIUS, a no-sugar fitness drink or supplement the Company states is designed (with exercise) to accelerate metabolism and burn body fat while providing energy.  CELSIUS comes in a ready-to-drink form and a powdered form, as well as various flavors and carbonated and non-carbonated options under the CELSIUS Originals and Vibe names.  In 2023, the Company introduced a new CELSIUS Essentials line, which contains essential amino acids and is available in 16-ounce cans.  The Company distributes its products through direct-to-store delivery, distributors, supermarkets, convenience stores, drug stores, nutritional stores, and mass merchants, as well as health clubs, gyms, the military, and e-commerce websites.

19.     Since breaking into the energy drink market, Celsius saw rapid growth, with sales and profits swelling, making Celsius an attractive investment to buy and hold.  For example, from $130.7 million in sales in 2020, its top line has grown to more than $1.3 ***billion*** in 2023.  The

Company's ability to maintain its rapid growth trajectory is, therefore, a critically important component of the price of Celsius securities.

20.     One key aspect of Celsius' skyrocketing growth has been its long-term strategic partnership with PepsiCo, Inc. ("Pepsi").  Specifically, on August 1, 2022, Celsius entered into a long-term distribution agreement and a separate transition agreement with Pepsi (collectively, the "Distribution Agreement") through which Pepsi would tap into its extensive network of retail and foodservice channels to become the primary distributor of Celsius products in the United States and Celsius' exclusive distributor in Canada.  Pepsi also gained the option to become the preferred distribution partner for Celsius in other international markets.  In connection with the Distribution Agreement, Celsius terminated various supply agreements with existing suppliers to transition certain territory rights to Pepsi.  Also in connection with the Distribution Agreement, Pepsi made a significant investment in Celsius, acquiring 1.5 million shares of convertible preferred stock – known as Series A Preferred Stock – for approximately $550 million, with the preferred shares entitled to a 5% annual dividend.  Shares underlying the transaction were priced at $75 per share, or approximately 7.33 million shares, which equated to Pepsi having an estimated 8.5% ownership in Celsius on an as-converted basis.  The transaction also resulted in Pepsi nominating a director, Pepsi deputy CFO James Lee, to serve on Celsius' Board in 2022, giving it substantial control and influence over the Company.

21.     The Company's partnership with Pepsi was touted positively by Celsius.  For example, on February 29, 2024, the Company stated in its 2023 annual report filed with the SEC on Form 10-K ("2023 10-K") that "this strategic alignment with Pepsi will not only continue to strengthen our distribution capabilities but also open up new opportunities for product development and market expansion."  The Company added that its reliance on Pepsi's distribution

expertise formed a "cornerstone" of Celsius' strategy to "enhance accessibility and presence in diverse retail environments, further solidifying our position in the competitive energy drink market."

22.     Following the Company's partnership with Pepsi, Celsius seemed to rapidly grow. Celsius' revenues grew from $653.6 million in 2022 to $1.318 billion in 2023, a stunning increase of 102%.  The Company credited its rapid revenue growth to increased revenues from North America, where 2023 revenues were over $1.2 billion, an increase of $645.9 million, or 105%, from 2022.  Celsius added that its North American revenues were driven by "continued gains in distribution points and SKUs per location."  Not only did Celsius rapidly grow revenues, it also reported 2023 gross margins of 48%.  In the fourth quarter of 2023, Celsius agreed to, along with Pepsi, expand its reach to Canada and began shipments to Pepsi Canada.

23.     During 2023, Celsius' sales to Pepsi constituted 59.4% of the Company's total net revenue (up from 22.2% during fiscal 2022), and receivables from Pepsi represented 69.0% of the Company's total receivables (up from 47.6% in fiscal 2022).  As a result of the Distribution Agreement with Pepsi, Celsius conceded it has reduced its distributor diversification and became "dependent on Pepsi's domestic distribution platforms."  As stated in Celsius' 2023 10-K, the Company's supply chain has a "significant concentration" with Pepsi:

> This partnership capitalizes on Pepsi's robust distribution channels to expand our reach into key market segments, including supermarkets, convenience stores, health clubs, and other retail outlets.  The alliance enhances our market penetration and brand visibility, contributing to our long-term growth strategy. Additionally, this collaboration aligns with our mission to innovate and deliver high-quality products to a broader consumer base.

24.     Looking forward, the 2023 10-K added that Celsius' "strategic alignment with Pepsi will not only continue to strengthen our distribution capabilities but also open up new opportunities for product development and market expansion."  Thus, Celsius' "reliance on Pepsi's

distribution expertise" formed a "cornerstone" of the Company's strategy to "enhance accessibility and presence in diverse retail environments, further solidifying [Celsius'] position in the competitive energy drink market."

25.     During the two years before the Company's partnership with Pepsi was finalized in August 2022, Celsius had already delivered average sales growth of over 100% – with revenues growing to $653.6 million in 2022 from $314.3 million in 2021 and from $130.7 million in 2020. But when Pepsi took over as Celsius' primary distributor, it loaded up on Celsius product inventory throughout the first year of their partnership – exponentially growing Celsius' 2023 revenues by another more than 100% – in just one year – to ***$1.318 billion*** during 2023.  Unbeknownst to investors, because Defendants concealed it, this was a one-time stock up that did not represent Pepsi's ongoing demand for Celsius product.  As such, the 2023 stock up caused Celsius to mislead investors, over-represent then-present demand for its Celsius' products, and conceal a massive glut of inventory in Pepsi's warehouses – for which Celsius already had recognized revenues once shipped to Pepsi – that would have be drawn down and would negatively impact Celsius' financial performance and outlook.

## MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

26.     The Class Period begins on February 29, 2024.  On that day, before trading opened, Celsius issued an earnings release announcing its financial results for the fourth quarter ended December 31, 2023 ("4Q23") and full year 2023.  The release highlighted record 4Q23 revenue of $347 million, up 95% from $178 million for the prior year fourth quarter, driven predominantly by North American revenue, which increased 97% to $333 million, up from $169 million the prior year.  The Company stated that "***North American revenue was driven by expansion in total distribution points and higher SKUs per location***."  The Company also reported large increases

in gross profit, which was $166 million for 4Q23, up 110% from $79 million for the prior year fourth quarter.  Gross profit as a percentage of revenue was 47.8% for 4Q23, up from 44.4% for the prior year fourth quarter.  The Company attributed its 340 basis point improvement in gross profit margin to "efficiencies in raw material sourcing, product waste reduction, and *benefits from improved leverage across promotional allowances*."  The 4Q23 earnings release quoted Fieldly as stating:

> "During the fourth quarter of 2023, Celsius delivered record revenue of $347 million and more than $39 million in net income, *driven by expanded availability of our products and increased consumer awareness*.  We continued to drive growth of the category by bringing in new loyal consumers, as well as increasing consumption occasions . . . ."

For the full year 2023, the February 29, 2024 earnings release attributed the Company's record revenue to "*continued gains in distribution points and SKUs per location*."

27.     As the market opened on February 29, 2024, the Company hosted a conference call to discuss its 4Q23 and FY23 results and outlook.  Fieldly opened his remarks by emphasizing that "[i]n 2023, Celsius set a new yearly revenue record, growing more than 102% or $664 million in sales to finish the year at just over $1.3 billion," emphasizing that "Celsius is now truly *a $1 billion brand*."  Fieldly also emphasized the Company's expanded distribution, stating Celsius "*achieved nearly complete distribution coverage* in the United States, topping 98% ACV, which is a major achievement, putting [Celsius] products in reach of more consumers and more consumption occasions with greater flavors and size options than ever before."[1]

28.     Continuing his opening remarks, Fieldly also highlighted the Company's "impressive" market share gains in 2023, stating that Celsius became the "first company to break

---

[1]     ACV stands for All Commodity Volume, and is a metric used to measure distribution coverage within a market.

the 10-share barrier in more than a decade."  He added that according to recent market data in the U.S. energy drink market for the 4-week period ended February 11, 2024, "Celsius held a new record of 11.5 share nationwide in MULOC."[2]  He added that as of January 2024, Celsius exceeded a 15 share in over a dozen U.S. markets.  Fieldly proclaimed: "The energy drink category is now a 3-team race."

29.    Fieldly also described the Company's plan to drive growth, stating:

> With nearly full distribution, we are focusing on driving growth through 3 areas: increasing total distribution points at each location, growing in nontracked channels and international expansion over the long-term horizon.  Celsius was again the top driver of the energy category in dollars and units sold in MULOC, ending in the fourth quarter, up 126.6% and up 140.2% for the full year of 2023, supporting a 30.6% of all the energy category growth for the year.

30.    Continuing with his opening remarks on the February 29, 2024 earnings call, Fieldly discussed an important factor in Celsius' growth and visibility to consumers: shelf space in stores.  To that end, he stated:

> In 2024, spring resets began in January and typically run through May.  ***We are very pleased with the incremental space we're gaining, which will be reflected across the first and second quarters of 2024***.  As a reminder, planograms used for most of 2023 when our dollar sales grew 140% were created while we were holding and held approximately 4.5 share in the category.  For 2024, shelf space planning was conducted with retail partners in Q3 of 2023, when we held a digital – double-digit share position.  ***Celsius is also now fully integrated into PepsiCo's annual planning cycle, and we anticipate ongoing close collaboration with our primary North American distribution partner and expanded key accounts team***.

> ***Our pursuit of a perfect store resulted in a 60% increase in display activity across the United States, and we placed more than over 10,000 Celsius branded coolers in 2023 and an increase of over 300% year-over-year***.  We intend to continue growing our base of branded coolers throughout this year.

---

[2]    MULOC stands for stands for Multi Outlet with Convenience Stores, and is used to measure how a product is performing in different retail settings.  The data typically looks at grocery retailers, drug stores, mass merchandisers, club stores, military commissaries, dollar stores, and select e-commerce sales, as well as convenience stores.

31.     As the call continued, CFO Langhans gave prepared remarks, and left no doubt that

the Company's financial performance was tied to its Pepsi partnership, stating:

> *As it relates to days on hand with our primary distributor, our inventory turns relative to depletions was consistent with our Q3 2023 turnover.*
>
> *We attribute our sales volume growth for the quarter compared to 2022 to several key drivers, including successful integration into the Pepsi distribution system, which has resulted in broader availability, increased SKU mix, and improved placement.*
>
> Gross profit for the 3 months ended December 31, 2023, increased 110% to $166 million, up from $79 million in the year ago quarter.  Gross profit margins in the fourth quarter were approximately 48% of revenues compared to approximately 44% for the prior year fourth quarter.  *The improvement in gross profit margins is attributed to efficiencies in raw material sourcing product-based reduction and benefits from improved leverage across promotional allowances.  Q4 was the fifth consecutive quarter that we were operating within the Pepsi distribution system, and we expect to continue driving efficiencies while maintaining our #1 goal of keeping the shelf stock to meet strong consumer demand.*

32.     As to projected results during 2024, then well underway, Langhans went on to state:

"As things stand today, we would expect 2024 gross profit margins to be fairly consistent with the

Q4 and full year margin profile, *as we are confident in maintaining the great progress that was

made in 2023*."

33.     On this news, the market price of Celsius common stock increased precipitously,

closing up more than $13.00 per share, or *nearly 17%*, at $81.62 per share on February 29, 2024,

on unusually high trading volume of more than 6.8 million shares traded, or more than 7 times the

average daily trading over the preceding 10 trading days.  This was welcome news not only for

investors in Celsius stock, but it also for sellers of put option contracts, who benefit when the value

of the underlying stock increases.

34.     By March 14, 2024, the price of Celsius common stock reached a Class Period high

of nearly $100.00 per share during intraday trading.  Meanwhile, with the market price of Celsius

common stock and securities artificially inflated based on Defendants' materially false and misleading statements, several of the Company's officers, directors, and insiders holding 10% of its common stock – including the Individual Defendants – cashed in, selling approximately ***$1.4 billion*** of their personally held shares of Celsius common stock at artificially inflated prices, as detailed herein at ¶59.

35.     On March 23, 2024, the Company entered into an amendment to its Distribution Agreement with Pepsi, "pursuant to which the Company will provide [Pepsi] with an incentive program, as set forth in the Amendment, designed to incentivize and compensate [Pepsi] for its continued focus on and actions to support the Licensed Products in the Territory, as such terms are defined in the Agreement."   There was no further disclosure as to what precipitated the amendment.   Company management downplayed any negative impact from the amended Distribution Agreement.   After speaking with Celsius management, analyst TD Cowen reported that it believed the amendment further aligned Pepsi's interests with Celsius' growth and that it did not expect any notable impact to Celsius' margins from the news.   Similarly, after speaking with Celsius management, Morgan Stanley reported that the amended agreement would help Celsius achieve its long-term growth aspirations and did not change the Company's long-term margin potential or short-term margin outlook.

36.     On March 28, 2024, the Company disclosed that Board member Alexandre Ruberti had notified the Company that he was resigning from the Board, "effective immediately," and that his "seat on the Board will remain vacant until the Board determines whether to fill the seat and a successor candidate is identified."

37.     Before the opening of trading on May 7, 2024, Celsius issued an earnings release announcing its financial results for the first quarter ended March 31, 2024 ("1Q24").  The release

once again emphasized the Company's "*[r]ecord first quarter revenue* of $355.7 million, up 37% year over year," "*[r]ecord first quarter gross profit* of $182.2 million, up 60% year over year," and its "[f]irst quarter diluted EPS of $0.27, *up 108% year over year*." The release also quoted the Individual Defendants emphasizing the Company's rapid growth and market share expansion, as well as shelf space gains, stating in pertinent part as follows:

> **John Fieldly, Chairman and CEO of Celsius Holdings, Inc. said**: "Celsius reported its best first quarter ever driving record revenue and contributing 47% of the quarterly year-over-year growth in the energy drink category. *Our category share of 11.5 percent as of April 14 reflects the early impact of shelf space gains that we are earning from company-record and ongoing retailer resets, which we believe will serve as a flywheel for our continued growth*. Celsius product innovation this year has delighted consumers with the most refreshing products we've ever created."

> **Jarrod Langhans, Chief Financial Officer of Celsius Holdings, Inc., said**: "Celsius' first quarter revenue of $356 million and year-over-year growth of 37 percent is a record, despite changes in days on hand inventory by our largest customer. Our solid 51 percent first quarter gross margin reflects a balanced and disciplined approach to leveraging *while simultaneously building the business and expanding globally*, as well as an accelerated benefit from raw materials pricing and reduced freight costs."

(Footnote omitted.)

38. The 1Q24 earnings release described the Company's share growth, stating that Celsius now "held an 11.5% share in the energy drink category in total U.S. MULOC for the last four weeks ended April 14, 2024 – a one-point increase over the prior quarter and approximately four points higher than one year ago." The release added that Celsius' market share performance "delivered quarter-over-quarter sales growth for Celsius of 9.6% during a period when the energy category declined 0.4%" and added that "[s]ugar-free segment sales in the first quarter were approximately 50% of the energy drink category."

39. The 1Q24 earnings release also provided information about the ongoing "shelf resets" in retail stores, where Celsius was working to expand its footprint, and stated:

We estimate that retailers' spring shelf resets were approximately one-third complete as of March 31, and once concluded, we are expecting our best shelf space gains in company history.  The importance of these space increases and placement improvements cannot be overstated.  The visual impact of multiple, full shelves of cold Celsius in convenience store coolers and on grocery shelves is a powerful in-store billboard and showcases more of the Celsius product portfolio.  The full effect of shelf space gains is expected to be reflected in scanner data beginning in July 2024.

40.     Despite the Company's record performance, the 1Q24 release disclosed that revenues were "offset" by "inventory movements" within Celsius' "largest distributor where first quarter 2024 inventory days on hand declined versus the fourth quarter resulting in an approximate $20 million impact, while first quarter 2023 revenue benefited from an inventory buildup of approximately $25 million."[3]  The 1Q24 release added that ongoing "***inventory fluctuations** may be expected*" in later quarters because Celsius' largest distributor – Pepsi – made up 62% of Celsius' total North American sales during 1Q24.  Nevertheless, the 1Q24 earnings release assured investors that "***retail sales of Celsius in total U.S. MULOC grew by 72.1% in the first quarter of 2024 year over year, and subsequent-period sales show ongoing consumer demand***."  (Footnote omitted.)

41.     Also on May 7, 2024, the Company hosted a conference call to discuss its 1Q24 financial results and outlook.  During the call, Fieldly opened his remarks by emphasizing Celsius' rapid growth, stating:

This morning, Celsius reported a 37% year-over-year increase in revenue for the first quarter of 2024, totaling $355.7 million for the period, a new first quarter revenue record for the company.

***Celsius alone was responsible for approximately 47% of the entire energy drink category growth year-over-year in the first quarter***.  And as we reported in

---

[3]     Days on hand of inventory, or "DOH," measures how many days a business takes to sell its inventory stock.  Since DOH is used to determine the number of days inventory remains in stock, the DOH value represents inventory liquidity.

this morning's press release, Celsius now holds an 11.5% share in MULOC for the 4 weeks period ending April 14, according to Circana. ***This is a full point higher than the Q4 2023 and 4 points higher than 1 year ago***.

*These results, on their own, are very strong, especially after growing at a triple digit for the past 3 consecutive years*.

42.     Continuing, Fieldly spoke about the Company's "inventory movements" and stated that Celsius' 1Q24 revenue "would have been higher, except that it was adversely affected due to inventory movements by our largest customer, which is beyond our control." Fieldly added that the "year-over-year inventory variation is attributable to elevated first quarter 2023 restocking, which we believe was meant to compensate for the fourth quarter 2022 destocking and to prepare for a robust spring reset that were planned in 2023," but that "no such first quarter restocking and spring reload in was observed this year," and that "***[a]bsent these effects, we would have seen a higher growth rate***." Fieldly did go on to remark that "[o]ngoing inventory fluctuations may be expected in subsequent quarters because our largest distributor constitutes approximately 62% of our total North America business during the first quarter of 2024," however, at the same time he also emphasized that "[w]hile these inventory ***fluctuations caused noise*** in our sequential quarterly revenue figures, ***what's important to focus on here is that Celsius is constantly on shelves, stocked cold, stacked high with a 98.4% ACV***" and "***our category across all tracked channels and on track channels continues to grow***."

43.     He further emphasized the purportedly still ongoing strong growth in demand, pointing investors to "space gain[s]" on shelves, stating in pertinent part as follows:

We estimate that retailers' spring resets were approximately 1/3 complete at the end of the quarter. And once concluded, ***we're expecting our best shelf space gains in the company history***.

*The importance of these space gain increases and placements and improvements cannot be overstated*. The visual impact of multiple full shelves of cold Celsius in convenience stores and coolers and in the grocery shelf is a powerful

in-store billboard and showcases our portfolio. ***The full effect of these shelf resets is expected to be reflected in the scanner data beginning in July***.

44.     Addressing the Company's "***new incentive program with Pepsi***," Fieldly added that it "***further aligns our shared interest*** within the energy category, including alignment around priorities and delivering a program that will contribute to our long-term goal of becoming the #1 energy drink brand in the world." Fieldly added that as the Company prepared for its summer advertising campaign, Celsius was "well positioned with the best in-store presence in company history" and "a strong aligned partnership with our North America distribution partner."

45.     During his opening remarks, Langhans stated that the Company was "continu[ing] to stick with our commentary from February, where we noted that ***gross margins in the high 40s was very achievable***."

46.     As the call moved into the question-and-answer portion, Defendants were asked about inventory levels and that Celsius seemed to be undershipping product relative to demand. In response, Fieldly stated that Celsius' "partners" – *i.e.*, Pepsi – were "***at really good inventory levels right now***" and that Celsius was "maintaining deliveries" and "keeping products in stock" and "just broke a record on the share gain to 11.5," assuring investors that "product is flowing." He added that while there would be "some optimization" of inventory "on both sides," Celsius felt "really good where we're at" and stated "we're in a really good place" and "***[w]e have good inventory levels now***." He concluded: "***We feel confident in our inventory levels and confident in Pepsi inventory levels supporting our growth***." When asked later in the call whether investors should "expect any more destocking," and whether that was "something we should watch out for," Fieldly pointed to sales "flowing" and being "strong," adding that "it seems to be like the balancing has been finalized" but that Celsius could not control what Pepsi would do with inventory levels.

47.     The statements referenced above in ¶¶26-32 and 37-46 were materially false and misleading when made because they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them, as follows:

(a)     Celsius materially oversold inventory to Pepsi far in excess of demand, and faced a looming sales cliff during which Pepsi would significantly reduce its purchases of Celsius products;

(b)     as Pepsi drew down significant amounts of inventory overstock, Celsius' sales would materially decline in future periods, hurting the Company's financial performance and outlook;

(c)     Celsius' sales rate to Pepsi was unsustainable and created a misleading impression of Celsius' financial performance and outlook;

(d)     as a result, Celsius' business metrics and financial prospects were not as strong as indicated in Defendants' Class Period statements; and

(e)     as a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times.

48.     On May 27, 2024, the price of Celsius stock surprisingly dropped as analysts and investors digested some of the latest retail store trends reported by Nielsen.  Morgan Stanley noted that Celsius' sales growth slowed sequentially in weekly retail data – slowing to 39% year-over-year in the week ended May 18, down from 50% in the week ended May 4 – that its market share dipped, and that pricing for Celsius' products was down 7.2% year-over-year.  Morgan Stanley cautioned that Celsius faced difficult sales comparisons over the next several quarters as it rolled over the anniversary of its Distribution Agreement with Pepsi.  Similarly, Stifel warned sales could

be dramatically diminished as Pepsi reduced the amount of Celsius inventory it held, noting that Pepsi's reduction of its Celsius product inventories could result in "2Q24 sales below end-demand."

49.     On this news, the price of Celsius stock tumbled.  After closing at $95.15 on May 24, 2024, the price of Celsius stock dropped nearly 13%, or $12.23 per share, to close at $82.92 per share on May 28, 2024 (the next trading day), on unusually high trading volume of nearly 17.5 million shares traded.  The sudden drop erased roughly $2.9 billion of the Company's market value as the share price dropped by the most in more than two years, causing Class members significant losses.

50.     On August 6, 2024, Celsius reported its second quarter 2024 ("2Q24") results, disclosing that revenue rose 23% year-over-year to $402 million, driven primarily by the North American business, a 30% jump in international sales to $19.6 million, and sales to Amazon that increased 41% to approximately $39.9 million.  Amid the Company's seemingly positive results, Celsius disclosed that revenue in 2Q24 was offset in part by a reduction in inventory days by a large distributor – Pepsi.  Nevertheless, the Company's reported EPS of $0.28 (up 65%) beat Wall Street expectations of $0.23, and the more than $400 million in quarterly sales topped analysts' consensus expectations of $393 million.  Commenting on the results, Fieldly stated Celsius reported "'its best second quarter financial results ever, delivering records in revenue, gross profit and gross margin.'"  During the Company's 2Q24 earnings call, the Company noted there had been a macroeconomic slowdown in the energy drink category, but that "Celsius still grew at 10x the category growth rate in the second quarter" and that the Company was "moving aggressively to gain our growth and momentum," and that Celsius has "great programs for the back half of the third quarter and into the fourth quarter."  In fact, in his opening remarks, Fieldly stated:

> Our partnership with Pepsi remains strong.  The added incentive program announced last quarter continues to percolate through the system and is expected to be fully ramped in the second half of this year where we have fully incentivized our partner to lean in with us.

51.     As the August 6, 2024 earnings call continued, Langhans discussed the Company's sales volume growth, including the impact of "inventory movements," stating, in relevant part:

> We attribute our sales volume growth for the quarter to several key factors, including our ability to drive increased consumer demand, strong innovation and excellent in-store execution by our key account and field sales teams, offset in part by inventory timing movements or days on hand associated with our largest distributor.
>
> During the quarter, we publicly stated that the impact of the inventory movements during the middle of June was approximately $20 million to $30 million.  As we closed the quarter, we saw a slight uptick in the days on hand, and as a result, the impact was at the lower end of that range.  Keep in mind, the energy drink category second quarter year-over-year unit sales volume was flat.

52.     During the question-and-answer portion of the call, Defendants were asked to quantify the impacts of Pepsi "tweaking" its inventories of Celsius products so that investors could "get a sense of what it actually ended up being in the quarter."  In response, Langhans stated:

> So I mentioned in the prepared remarks and back in June that there was kind of a potential $20 million to $30 million headwind because of the DOH changes.  So that ended up on the back half of – so the lower end of that range, so more in the 20 to 25 range as opposed to the higher end of the range.  So that's where we ended the quarter when it relates to that piece.

53.     Then, approximately one month later during the trading day on September 4, 2024, Fieldly and Celsius Chief of Staff Toby David ("David") presented at the Barclays 17th Annual Global Consumer Staples Conference.  During the conference, Fieldly discussed the Company's Distribution Agreement with Pepsi, and revealed that Celsius' sales to Pepsi were reduced from "roughly around [$]100 million to [$]120 million . . . from what [Pepsi] ordered last quarter."  Fieldly added Celsius was "still seeing these inventory levels being reduced" and that it had "increased" in the third quarter of 2024.  Adding on, David stated: "[J]ust to be precise with the

[$]100 million to [$]120 million figure, . . . *we're seeing approximately [$]100 million to [$]120 million less in orders to Pepsi in Q3 this year versus Q3 last year*."  David added that because Celsius recognizes revenue when Celsius products are delivered to Pepsi – not when sold in stores to consumers – that store-level sales were not capable of capturing the lost revenue.  David went on to say: "What we are seeing correlate is depletions out of the Pepsi warehouse" which "simply means that *they were holding to several million more cases over the past 1.5 years than they really needed to hold*, and they're optimizing their network now."  In other words, Celsius' sales to Pepsi far outstripped market demand for Celsius products, and Pepsi was drawing down excess inventory from its warehouses.  Without that excess inventory being sold to Pepsi, Celsius' reported financial results in prior periods would have been materially lower.

54.     While Celsius presented at the Barclays' conference, the price of Celsius stock dropped in tandem with the surprisingly negative news.  After opening at $36.50 per share, and reaching as high as $37.60 per share, the price of Celsius stock began slumping shortly after noon in response to Fieldly's and David's disclosures, falling 11.6% to close at $32.39 per share on unusually high trading volume of more than 18.6 million shares traded, causing Class members significant losses.

55.     Finally, on November 6, 2024, before the opening of trading, Celsius reported its third quarter 2024 ("3Q24") results, disclosing the full unsustainable impact Pepsi's Class Period product loading had had on the Company's business metrics and financial prospects.  The press release issued that day quoted Fieldly lamenting the "'[p]ronounced supply chain optimization by'" Pepsi that he emphasized "'had an outsized and adverse impact on [Celsius'] operating results,'" while Langhans also lamented that Celsius' "'[g]ross and operating margins in the third quarter fell short due to significantly reduced orders because [its] largest distributor implemented

a sizable . . . supply chain optimization program in the quarter.'"  As a result, Celsius' overall 3Q24 "revenue was approximately $265.7 million, compared to $384.8 million for the" 3Q23, a **31%** decline, Celsius' North American revenues fell **33%**, and its "'[r]evenue from [Pepsi] declined $123.9 million,'" while "[c]oncurrently, related retailer promotional allowances created revenue headwinds."  Celsius disclosed that its 3Q24 "gross profit decreased by $71.9 million, or **37%**, to $122.2 million from $194.1 million" in the 3Q23, that its 3Q24 "[g]ross profit margin was 46.0% . . . , a 440 basis point decrease from 50.4% for the same period in 2023," and that the "decrease in gross profit was due to promotional allowances, incentives, and other billbacks as a percentage of gross revenue" resulting from Pepsi's drawdown.

56.     When trading resumed November 6, 2024, the market price of Celsius common stock on this news fell another $1.69 per share, or approximately 5%, on unusually high volume of more than 22.5 million shares trading, or more than 3.5 times the average daily volume over the preceding 10 trading days, causing Class members significant losses.

57.     As a result of Defendants' wrongful acts and omissions, and the subsequent declines in the market value of Celsius securities, Plaintiff and other Class members suffered losses and damages.

### ADDITIONAL SCIENTER ALLEGATIONS

58.     As alleged herein, Celsius and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their

receipt of information reflecting the true facts regarding Celsius, their control over, and/or receipt and/or modification of Celsius' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Celsius, participated in the fraudulent scheme alleged herein.

59.     Meanwhile, with the market price of Celsius common stock artificially inflated based on Defendants' materially false and misleading statements, several of the Company's officers, directors, and insiders holding 10% of its common stock – including  the Individual Defendants – cashed in, selling more than *21.6 million* of their personally held shares of Celsius common stock at fraud-inflated prices, reaping more than *$1.4 billion* in proceeds as follows:

| SELLER | DATE(S) | SHARES | PRICE RANGE | PROCEEDS |
|---|---|---|---|---|
| FIELDLY | 3/4/24 | 119,604 | $85.07 | $10,174,712 |
| LANGHANS | 3/4/24 – 4/19/24 | 9,579 | $69.42-$85.61 | $754,019 |
| TONY GUILFOYLE EVP North American Sales/Chief Commercial Officer | 3/4/24 | 24,357 | $79.75 | $1,942,471 |
| PAUL STOREY Chief Supply Train Officer | 3/4/24 – 5/7/24 | 11,833 | $75.43-$79.75 | $935,763 |
| KYLE WATSON Chief Marketing Officer | 3/12/24 | 40,000 | $89.17 | $3,566,800 |
| HAL KRAVITZ Independent Lead Director | 5/14/24 | 16,500 | $90.27 | $1,489,455 |
| CAROLINE LEVY Director | 3/13/24 | 20,000 | $94.77 | $1,895,400 |
| CHERYL MILLER Director | 3/4/24 | 3,000 | $83.66 | $250,980 |
| ALEXANDRE RUBERTI Director | 3/4/24 | 23,000 | $83.17 | $1,912,910 |
| NICHOLAS CASTALDO 10% Holder | 3/4/24 | 165,000 | $83.33 | $13,749,450 |
| DEAN DESANTIS 10% Holder | 3/4/24 – 5/16/24 | 7,153,880 | $59.67-$95.75 | $463,425,603 |

| SELLER | DATE(S) | SHARES | PRICE RANGE | PROCEEDS |
|---|---|---|---|---|
| **DEBORAH DESANTIS** 10% Holder | 3/4/24 – 5/7/24 | 7,000,000 | $59.67-$67.46 | $448,850,000 |
| **WILLIAM MILMOE** 10% Holder | 3/4/24 – 5/17/24 | 7,105,000 | $59.67-$92.95 | $452,638,200 |
| *Totals* | | *21,691,753* | | *$1,401,585,763* |

60.     These sales were all in unusual amounts at unusual times based on these officers',

directors', and/or insiders' historical trading practices.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET

61.     At all relevant times, the market for Celsius securities was efficient for the

following reasons, among others:

(a)     Celsius common stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient, national stock market;

(b)     as a regulated issuer, Celsius filed periodic public reports with the SEC;

(c)     Celsius regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of investor releases

on the major news wire services and through other wide-ranging public disclosures, such as

communications with the financial press, securities analysts, and other similar reporting services;

(d)     Celsius was followed by several securities analysts employed by major

brokerage firms who wrote reports that were distributed to the sales force and certain customers

of their respective brokerage firms.  Each of these reports was publicly available and entered the

public marketplace; and

(e)     unexpected material news about Celsius was rapidly reflected in and

incorporated into the price of Celsius securities during the Class Period.

62.     As a result of the foregoing, the market for Celsius securities promptly digested current information regarding Celsius from all publicly available sources and reflected such information in the price of Celsius securities.  Under these circumstances, all purchasers of Celsius stock and sellers of put options during the Class Period suffered similar injury through their respective transactions in Celsius securities at artificially inflated prices and a presumption of reliance applies.

63.     Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants include omissions of material fact for which there was a duty to disclose.

### LOSS CAUSATION/ECONOMIC LOSS

64.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Celsius securities and operated as a fraud or deceit on Class Period purchasers of Celsius stock and sellers of put options by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Celsius securities fell significantly, as the prior artificial inflation came out of the price of such securities.  As a result of their purchases of Celsius stock and sale of put options during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e*., damages, under the federal securities laws when the truth about Celsius was revealed through the disclosures specified herein, which removed the artificial inflation from the price of Celsius securities.

65.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Celsius' business and prospects.  Defendants' false and

misleading statements had the intended effect and caused Celsius securities to trade at artificially inflated levels throughout the Class Period.

66.     As a direct result of the disclosures identified herein, the price of Celsius securities fell precipitously.  This removed the artificial inflation from the price of Celsius securities, causing real economic loss to investors.

67.     The price declines were a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market through partial disclosures.  The timing and magnitude of the price declines in Celsius securities negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Celsius securities and the subsequent significant declines in the value of Celsius securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**NO SAFE HARBOR**

68.     The "Safe Harbor" warnings accompanying Celsius' reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports and prepared in accordance with generally accepted accounting principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

69.     Defendants are also liable for any false and misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

authorized and/or approved by an executive officer of Celsius who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

70.     Plaintiff incorporates ¶¶1-69 by reference.

71.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other members of the Class, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Celsius stock or sell put options at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

72.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and others similarly situated in connection with the purchases of Celsius stock or sale of put options during the Class Period, in an effort to maintain artificially high market prices for Celsius securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons, as alleged below.

73.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Celsius' business operations and financial prospects, as alleged herein.

74.     Defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Celsius' value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company's business metrics and financial prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Celsius stock or sellers of put options during the Class Period.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases of Celsius stock or sale of put options during the Class Period, because, in reliance on the integrity of the market, they transacted in Celsius securities at artificially inflated prices and experienced loses as a consequence of the artificial inflation being released from the price of Celsius securities as a result of the partial revelations and price declines detailed herein.  Plaintiff and the Class would not have purchased Celsius stock or sold put options at such prices, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

76.     By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

77.     Plaintiff incorporates ¶¶1-69 by reference.

78.     The Individual Defendants each acted as a controlling person of Celsius within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and participation in and/or awareness of the true state of the Company's business metrics and financial prospects, the Individual Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the press releases concerning the Company's business metrics and financial prospects.

79.     As set forth above, Celsius and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, the Individual Defendants are each liable pursuant to §20(a) of the Exchange Act.

80.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases of Celsius stock or sale of put options during the Class Period because, in reliance on the integrity of the market, they transacted in Celsius securities at artificially inflated prices and experienced loses as a consequence of the artificial inflation being released from the price of Celsius securities as a result of the partial revelations and price declines detailed herein.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment:

A.      Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as Lead Plaintiff under the Private Securities Litigation Act of 1995, and appointing Plaintiff's counsel as Lead Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  January 14, 2025                    ROBBINS GELLER RUDMAN
                                                                   & DOWD LLP
                                                            ROBERT J. ROBBINS
                                                            FLORIDA BAR NO. 0572233
                                                            STEPHEN A. ASTLEY
                                                            FLORIDA BAR NO. 0139254


                                                            _____/s/ Robert J. Robbins_____
                                                            ROBERT J. ROBBINS

                                                            225 NE Mizner Boulevard, Suite 720
                                                            Boca Raton, FL  33432
                                                            Telephone:  561/750-3000
                                                            rrobbins@rgrdlaw.com
                                                            sastley@rgrdlaw.com

- 29 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

*Attorneys for Plaintiff*